No. 24-10875

In the United States Court of Appeals for the Eleventh Circuit

FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION, ET AL.,

*Plaintiffs–Appellants*,

v.

ADMINISTRATOR FOR THE CENTERS FOR MEDICARE & MEDICAID SERVICES, ET AL.,

*Defendants–Appellees*.

**APPELLANTS' OPENING BRIEF**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA CASE NO. 0:23-CV-61595-WPD

ASHLEY MOODY
 *Attorney General*
HENRY C. WHITAKER
 *Solicitor General*
JAMES H. PERCIVAL
 *Chief of Staff*
NATALIE P. CHRISTMAS
 *Senior Counselor*

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
henry.whitaker@myfloridalegal.com

*Counsel for the State of Florida*

Jesse Panuccio
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Ste. 1200
Fort Lauderdale, FL 33301
(954) 356-0011
jpanuccio@bsfllp.com

David M. Lehn
BOIES SCHILLER FLEXNER LLP
1401 New York Ave. N.W.
Washington, D.C. 20002
(202) 237-2727
dlehn@bsfllp.com

*Counsel for the Florida Agency for Health Care Administration*

*Florida Agency for Health Care Administration, et al. v. Administrator for the Centers for Medicare & Medicaid Services, et al.*
*Eleventh Circuit Case No. 24-10875*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

<u>11th Cir. R. 26.1-1 Certification</u>: Appellants identify the following trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this particular case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of a party's stock, and other identifiable legal entities related to a party:

Augustin-Birch, Panayotta D. (Magistrate Judge)

Becerra, Xavier (Defendant)

Bennett, Michelle (Counsel to Defendants)

Boies Schiller Flexner LLP (Counsel to Plaintiff Florida Agency for Health Care Administration)

Boynton, Brian M. (Counsel to Defendants)

Brooks-LaSure, Chiquita (Defendant)

Centers for Medicare & Medicaid Services (Defendant)

Christmas, Natalie (Counsel to Plaintiff the State of Florida)

Dimitrouleas, William P. (District Judge)

Florida Agency for Health Care Administration (Plaintiff)

Guard, John (Counsel to Plaintiff the State of Florida)

*Florida Agency for Health Care Administration, et al. v. Administrator for the Centers for Medicare & Medicaid Services, et al.*
*Eleventh Circuit Case No. 24-10875*

Hinshelwood, Bradley A. (Counsel to Defendants)

Klein, Alisa B. (Counsel to Defendants)

Lehn, David M. (Counsel to Plaintiff Florida Agency for Health Care Administration)

Mandel, Matthew H. (Counsel to Amici National Minority Quality Forum and Saving Hospitals Saves Lives)

Miller, Cameron C. (Counsel to Plaintiff Florida Agency for Health Care Administration)

Moody, Ashley (Attorney General of Plaintiff the State of Florida)

National Minority Quality Forum (Amicus Curiae)

Panuccio, Jesse (Counsel to Plaintiff Florida Agency for Health Care Administration)

Percival, James H. (Counsel to Plaintiff the State of Florida)

Saslaw, Alexandra R. (Counsel to Defendants)

Saving Hospitals Saves Lives (Amicus Curiae)

Sheeran, Andrew T. (Counsel to Plaintiff Florida Agency for Health Care Administration)

State of Florida (Plaintiff)

United States Department of Health & Human Services (Defendant)

United States Department of Justice (Counsel to Defendants)

United States of America (Defendant)

*Florida Agency for Health Care Administration, et al. v. Administrator for the Centers for Medicare & Medicaid Services, et al.*
*Eleventh Circuit Case No. 24-10875*

Weida, Jason (Secretary of Plaintiff Florida Agency for Health Care Administration)

Weiss Serota Helfman Cole & Bierman, P.L. (Counsel to Amici National Minority Quality Forum and Saving Hospitals Saves Lives)

Whitaker, Henry C. (Solicitor General of Plaintiff the State of Florida)

11th Cir. R. 26.1-3 Certification: No publicly traded company or corporation has an interest in the outcome of this appeal.

11th Cir. R. 26.1-2 Certification: The undersigned certifies that this certificate of interested persons is complete at the time of filing.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument. This appeal presents questions of federal law concerning state funding of critical healthcare programs, as well as the Administrative Procedure Act's requirement of final agency action. Appellants respectfully submit that the decisional process will be aided by the Court's opportunity to question the parties regarding their arguments.

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ............................................... i

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT OF JURISDICTION ........................................................... 1

STATEMENT OF ISSUES .................................................................... 1

INTRODUCTION ............................................................................. 2

STATEMENT OF THE CASE ................................................................. 5

    I.    STATEMENT OF FACTS .............................................................. 5

        A.    The Medicaid Shortfall and Supplemental Medicaid Funding in Florida ........................................................................ 5

        B.    The Act's Prohibition on "Hold Harmless Provisions" .................. 6

        C.    HHS's Longstanding Position That Independent Arrangements Among Private Providers Are Not Direct Guarantees ...................... 7

        D.    CMS's Abandoned Rulemaking to Prohibit Private Redistribution Arrangements ................................................ 10

        E.    CMS's Issuance of an "Informational Bulletin" Adopting an Expected-Effect Test for the First Time ................................... 11

        F.    CMS's "Financial Management Review" of Florida's LPPFs ...... 14

        G.    The Preliminary Injunction of CMS's New Policy in Texas ......... 15

    II.    PROCEEDINGS BELOW .............................................................. 16

    III.    SUBSEQUENT ADMINISTRATIVE DEVELOPMENTS ..................................... 17

    IV.    STANDARD OF REVIEW ............................................................. 20

SUMMARY OF ARGUMENT ................................................................ 21

ARGUMENT ................................................................................. 22

I.    THE DISTRICT COURT ERRED IN DISMISSING FOR LACK OF FINAL ACTION ................................................................................22

    A.    The Bulletin Is Final Action.............................................22

        1.    *The Bulletin Is Final Because It Announces a Rule to Which Florida Must Conform Now, to Florida's Detriment* ................................................................22

        2.    *The District Court's Analysis Is Incorrect*................29

        3.    *The Bulletin Announced a New Policy; It Did Not Reiterate a Preexisting One* .......................................34

    B.    The District Court Erroneously Relied on the FMR.....................38

II.    THIS COURT SHOULD REJECT CMS'S OTHER JURISDICTIONAL ARGUMENTS ............................................................................39

    A.    Florida's Claims Are Ripe .................................................40

    B.    Section 1316(e) Does Not Preclude Judicial Review ...................41

III.    FLORIDA IS ENTITLED TO A PRELIMINARY INJUNCTION ...........................46

    A.    Florida Is Likely to Succeed on the Merits...................47

        1.    *The Bulletin's Policy Is Contrary to Law* ................47

        2.    *The Bulletin Is Arbitrary and Capricious* ................53

        3.    *The Bulletin Is Procedurally Invalid* .......................55

    B.    Florida Will Suffer Irreparable Harm ............................56

    C.    The Public Interest and the Balance of Equities Favor a Preliminary Injunction ...................................................57

CONCLUSION.................................................................................57

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS.........59

CERTIFICATE OF SERVICE .............................................................60

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abbott Laboratories v. Gardner*,
   387 U.S. 136 (1967) ................................................................ 3, 23, 33, 41, 42

*Alfa Int'l Seafood v Ross*,
   264 F. Supp. 3d 23 (D.D.C. 2017) ........................................................38

*Aluminum Co. of Am. v. U.S.*,
   790 F.2d 938 (D.C. Cir. 1986) ..............................................................33

*Axon Enter., Inc. v. FTC*,
   598 U.S. 175 (2023) ................................................ 42, 43, 44, 45, 46

*Azar v. Allina Health Servs.*,
   587 U.S. 566 (2019) ..............................................................................55

*Blanco v. Samuel*,
   91 F.4th 1061 (11th Cir. 2024).............................................................35

*Boyes v. Shell Oil Prod. Co.*,
   199 F.3d 1260 (11th Cir. 2000)............................................................40

*Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*,
   942 F.3d 1215 (11th Cir. 2019).............................................................21

*CEC Energy Co. v. Pub. Serv. Comm'n of Virgin Islands*,
   891 F.2d 1107 (3d Cir. 1989) ..............................................................33

*City of Boca Raton v. State*,
   595 So.2d 25 (Fla. 1992) ........................................................................6

*Commodity Futures Trading Comm'n v. Schor*,
   478 U.S. 833 (1986) ..............................................................................37

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
   591 U.S. 1 (2020) ..................................................................................54

*Doe v. FAA*,
    432 F.3d 1259 (11th Cir. 2005).....................................................42, 44

*Dream Defs. v. Governor of the State of Fla.*,
    57 F.4th 879 (11th Cir. 2023)..............................................................47

*DRG Funding Corp. v. Secretary of HUD*,
    76 F.3d 1212 (D.C. Cir. 1996) ............................................................31

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*,
    653 F.3d 1 (D.C. Cir. 2011)..................................................................55

*Elgin v. Dep't of Treasury*,
    67 U.S. 1 (2012) ...................................................................................45

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) .............................................................................53

*Experts Are Us, Inc.*,
    2010 WL 2940935, Decision No. 2322 (D.A.B. 2010) .......................44

*F.T.C. v. Standard Oil Co. of Cal.*,
    449 U.S. 232 (1980) .............................................................................33

*Free Enter. Fund v. PCAOB*,
    561 U.S. 477 (2010) ...........................................................22, 43, 44, 45, 46

*Georgia v. President of the United States*,
    46 F.4th 1283 (11th Cir. 2022)............................................................56

*Immigration & Naturalization Serv. v. St. Cyr*,
    533 U.S. 289 (2001). ............................................................................52

*In re Hawaii Department of Human Services Board*,
    2005 WL 1540188, Decision No. 1981 (D.A.B. 2005) ...........................8, 37, 52

*Kerr for Kerr v. Comm'r of Soc. Sec.*,
    874 F.3d 926 (6th Cir. 2017)..........................................................39, 40

*Kisor v. Wilkie*,
    588 U.S. 558 (2019) .............................................................................55

v

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016).................................................................57

*Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*,
    939 F.3d 1145 (11th Cir. 2019)...........................................................21

*Nat'l Council for Adoption v. Blinken*,
    4 F.4th 106 (D.C. Cir. 2021) ........................................................ 55, 56

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003) ...........................................................................41

*Nat'l Parks Conservation Ass'n v. Norton*,
    324 F.3d 1229 (11th Cir. 2003)...........................................................30

*Nixon v. Missouri Mun. League*,
    541 U.S. 125 (2004) ...........................................................................50

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*,
    588 U.S. 1 (2019) ...........................................................................4, 23

*Protestant Mem'l Med. Ctr., Inc. v. Maram*,
    471 F.3d 724 (7th Cir. 2006)...............................................................48

*Resnick v. KrunchCash, LLC*,
    34 F.4th 1028 (11th Cir. 2022).............................................................20

*Salt Lake Cmty. Action Program, Inc. v. Shalala*,
    11 F.3d 1084 (D.C. Cir. 1993) ............................................................45

*State of Tennessee v. Department of Education*,
    104 F.4th 577 (6th Cir. 2024)....................................... 29, 43, 44, 45, 46

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ...........................................................................41

*Tallahassee Mem'l Reg'l Med. Ctr. v. Cook*,
    109 F.3d 693 (11th Cir. 1997)...............................................................5

*Texas v. Brooks-LaSure*,
    680 F. Supp. 3d 791 (E.D. Tex. 2023) ............. 3, 9, 15, 16, 24, 35, 38, 41, 46, 49

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) .......................................................................15

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
  578 U.S. 590 (2016) ................................................................. 23, 24

*U.S. Steel Corp. v. Astrue*,
  495 F.3d 1272 (11th Cir. 2007) .......................................................23

*W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*,
  59 F.4th 1124 (11th Cir. 2023) .......................................................52

*Warshauer v. Solis*,
  577 F.3d 1330 (11th Cir. 2009) .......................................................56

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
  165 F.3d 43 (D.C. Cir. 1999) ..........................................................35

**Statutes**

5 U.S.C. § 551(4) ............................................................................22

5 U.S.C. § 702 ................................................................................44

5 U.S.C. § 706 ................................................................... 47, 54, 55

42 U.S.C. § 1316 ............................................................ 15, 41, 42, 43

42 U.S.C. § 1396 ...........................................................................5, 49

42 U.S.C. § 1396a .................................................................... 33, 49

42 U.S.C. § 1396b ....................................... 2, 6, 9, 12, 16, 47, 51, 53

**Regulations**

42 C.F.R. § 430.3 ...........................................................................42

42 C.F.R. § 430.42 ..........................................................................12

42 C.F.R. § 431.958 ........................................................................12

42 C.F.R. § 433.68 ............................................... 7, 8, 12, 35, 51

42 C.F.R. § 433.74 ...............................................................................34

42 C.F.R. § 438.6 ................................................................................18

45 C.F.R. § 75.364 ..............................................................................33

45 C.F.R. pt. 16, App. A(a)(1) ...........................................................43

*Medicaid Program; Health Care-Related Taxes*,
    73 Fed. Reg. 9,685 (Feb. 22, 2008)................................ 9, 36, 37, 51

*Medicaid Program; Medicaid Fiscal Accountability Regulation*,
    84 Fed. Reg. 63,722 (Nov. 18, 2019)....................................................10

*Medicaid Program; Medicaid Fiscal Accountability Regulation*,
    86 Fed. Reg. 5,105 (Jan. 19, 2021)............................................. 10, 11

*Medicaid Program; Medicaid and Children's Health Insurance Program
    (CHIP) Managed Care Access, Finance, and Quality*,
    89 Fed. Reg. 41,002 (May 10, 2024)............................... 18, 20, 28, 42

## Other Authorities

*Comments on Medicaid Program: Medicaid Fiscal Accountability Regulation*
    [CMS2393-P] (Jan. 27, 2020) .............................................................11

HHS OIG, *Review of Medicaid Disproportionate Share Funds Flow in the
    State of Missouri*, Report No. A-07-02-02097 (Apr. 2003)...................8

Opening Brief for Appellant, *Kindred Hosps. E., LLC v. Sebelius*,
    2012 WL 248356 ..................................................................................9

Random House Unabridged Dictionary (2d ed. 1993) ..................... 48, 49

## STATEMENT OF JURISDICTION

1.     The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because this case concerns the legality of a federal agency's action under the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*

2.     On March 6, 2024, the U.S. District Court for the Southern District of Florida denied Plaintiffs' motion for a preliminary injunction, granted Defendants' motion to dismiss under Rule 12(b)(1), and directed the clerk to close the case.  Doc. 53; *see* Doc. 48.[1]  On March 21, 2024, Plaintiffs timely noticed this appeal from that final judgment, Doc. 54, and this Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.     Whether the challenged agency bulletin is final action.

2.     Whether Plaintiffs' claims are ripe.

3.     Whether Plaintiffs' suit is barred by 42 U.S.C. § 1316(e).

4.     Whether Plaintiffs are otherwise entitled to a preliminary injunction.

---

[1] District court docket entries are cited as "Doc. # at #," where the page number refers to the document's original pagination, not the CM/ECF pagination.

**INTRODUCTION**

The Social Security Act ("Act") allows States to increase funding for their Medicaid programs by raising revenue through healthcare-related taxes imposed on providers (generally hospitals) and then obtaining federal matching funds on that tax revenue. The Act prohibits such matching "if there is in effect a hold harmless provision," which—as relevant here—is defined as the "unit of government imposing the tax provid[ing] (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax." 42 U.S.C. § 1396b(w)(1)(A)(iii), (w)(4). For more than fifteen years, the Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") consistently stated that a prohibited hold-harmless provision exists only if *the taxing government* requires or promises that the taxpayer will be reimbursed for the tax—and, accordingly, that private arrangements among providers do not constitute hold-harmless provisions. This position was consistent with the plain text of the Act, which links the hold-harmless guarantee to the "unit of government imposing the tax."

In February 2023, however, CMS issued a "Bulletin" announcing for the first time a nationwide rule that deems purely *private* redistribution arrangements as prohibited hold-harmless provisions. In other words, any private financial arrangement between or among hospitals that results in an offset of tax payments

2

constitutes a prohibited "hold harmless provision" even if the taxing authority has no role in, or knowledge of, that purely private arrangement. The Bulletin instructs that any State in which such private arrangements exist will be stripped of Medicaid matching funds.

Because this rule contravenes the plain text of the Act and threatens to upend the provision of Medicaid services, the State of Florida and its Agency for Health Care Administration ("AHCA"; together, "Florida") filed this suit against CMS and other federal actors, asking that the Bulletin be set aside because it is contrary to law, is arbitrary and capricious, and was issued without the required notice-and-comment rulemaking. The State of Texas filed a nearly identical suit in a Texas district court. Texas's request for a preliminary injunction was granted, *Texas v. Brooks-LaSure*, 680 F. Supp. 3d 791 (E.D. Tex. 2023), but the district court here denied Florida's indistinguishable request and dismissed the case for lack of final agency action—an argument rejected in *Texas*.

The decision below should be reversed. This case presents a standard pre-enforcement facial challenge. It is well-settled that regulated actors may bring pre-enforcement facial challenges to agency rules that require the actor to either conform or incur a penalty. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 150–52 (1967). And the Bulletin fits the bill: it prohibits private redistribution arrangements, requires States to collect and report extensive information and to police private

3

actors' conduct, and imposes severe penalties on States for any violations of those requirements, namely, losing the associated federal matching funds—which, in Florida, amounts to billions of dollars annually.  In focusing on the possibility that CMS will decide whether Florida's system complies with the Bulletin after finishing its pending review of that system, the district court ignored that *Abbott* "expand[ed] the opportunities for judicial review by allowing *both* facial, pre-enforcement challenges *and* as-applied challenges to agency action … in enforcement actions." *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1, 16 (2019) (Kavanaugh, J., concurring, joined by Thomas, Alito, and Gorsuch, JJ.).

Further, this Court should reject CMS's other jurisdictional objections—that Florida's claims are unripe and that another section of the Act precludes district-court review of the Bulletin—and should conclude that Florida is entitled to a preliminary injunction.  Although the court below failed to reach these issues, this Court should decide them now because they are purely legal, they are integral to the outcome of the case, and hastening the case's resolution will enable Florida to better manage its Medicaid program for millions of residents.

## STATEMENT OF THE CASE

I.  STATEMENT OF FACTS

### A.    The Medicaid Shortfall and Supplemental Medicaid Funding in Florida

Authorized under the Social Security Act, 42 U.S.C. § 1396 *et seq*., Medicaid is "designed to allow states to receive matching funds from the federal government" on their own healthcare expenditures—called federal financial participation ("FFP")—"to finance medical services to certain low-income persons." *Tallahassee Mem'l Reg'l Med. Ctr. v. Cook*, 109 F.3d 693, 698 (11th Cir. 1997).  Florida annually disburses tens of billions of dollars in base Medicaid funds, about sixty percent of which is FFP, to serve more than five-million Floridians.  Doc. 10-1 ¶¶ 5–6.

In Florida, base Medicaid funding—i.e., state expenditures and FFP—covers less than half of providers' actual costs for Medicaid-eligible healthcare.  Doc. 10-1 ¶¶ 6, 8, 15.  This shortfall threatens the ability of private hospitals to provide healthcare to millions of low-income Floridians.  *Id.* ¶¶ 38–39.

To reduce that shortfall, Florida has authorized the supplemental Directed Payment Program ("DPP"), which is authorized by the Act and approved by CMS. To participate in the DPP, Florida municipalities and counties may levy a special healthcare assessment on all private hospitals within their jurisdiction.  Doc. 10-1

5

¶¶ 9–10.[2]   The revenue raised by a locality is pooled in a locality-administered account called a Local Provider Participation Fund ("LPPF") and then transferred to AHCA, which administers Florida's Medicaid program. *Id.* ¶ 11.   AHCA then obtains FFP on that revenue and disburses the FFP (combined with state expenditures) as supplemental hospital funding. *Id.* ¶ 12.  So far, twenty-one Florida localities have imposed such assessments and established associated LPPFs. *Id.* ¶¶ 16–17.  The State of Florida (including AHCA) does not impose, direct, require, or control these local assessments and does not indemnify or reimburse any hospitals for the costs of their assessments. *Id.* ¶¶ 19–20.

In its first three years, the DPP generated $1.8 billion, $2.1 billion, and $3.4 billion (expected) in supplemental Medicaid funding, about sixty percent of which was FFP.  Doc. 10-1 ¶¶ 13–15.  Accounting for about nine percent of the State's total Medicaid budget, the DPP has become integral to Florida's healthcare system. *Id.* ¶¶ 13–15, 28, 38–39.

### B.   The Act's Prohibition on "Hold Harmless Provisions"

The Act prohibits federal matching on state funds raised through a healthcare-related tax "if there is in effect a hold harmless provision … with respect to the tax." 42 U.S.C. § 1396b(w)(1)(A)(ii)-(iii), (3)(B).   The Act carefully defines three

---

[2] Consistent with the applicable federal statutory scheme, *see* 42 U.S.C. § 1396b(w)(7)(F), this brief refers to these assessments as "taxes," but they are not taxes under Florida law, *City of Boca Raton v. State*, 595 So.2d 25, 29 (Fla. 1992).

circumstances in which a hold-harmless provision is in effect.  This case involves only the third circumstance:

> The State or other unit of government imposing the tax provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax.

*Id.* § 1396b(w)(4)(C)(i).  The Act further provides that, for purposes of section 1396b(w)(4)(C)(i), "a determination of the existence of an indirect guarantee shall be made under" a specified CMS regulation, § 1396b(w)(4)(C)(ii), which sets forth a "two prong" test based on the ratio between the taxes paid and the Medicaid funds received by the taxpayers, 42 C.F.R. § 433.68(f)(3)(i).  The statute does not further elaborate the meaning of a *direct* guarantee—which, all parties agree, is the subject of this case.

### C.    HHS's Longstanding Position That Independent Arrangements Among Private Providers Are Not Direct Guarantees

Consistent with the plain text of section 1396b(w)(4)(C)(i), for more than fifteen years, HHS repeatedly and consistently took the position that arrangements among private entities do not qualify as a prohibited "hold-harmless provision" under section 1396b(w)(4)(C)(i).

In 2003, HHS's Office of Inspector General ("OIG") concluded that "voluntary [agreements] between the hospital providers and" a hospital association to pool and redistribute Medicaid funding through the association were not hold-

harmless provisions.  HHS OIG, Review of Medicaid Disproportionate Share Funds Flow in the State of Missouri, Report No. A-07-02-02097, at 6 (Apr. 2003).[3]

In 2005, HHS's Departmental Appeals Board ("DAB") rejected CMS's argument that "all [CMS] needs to do to show a direct guarantee is to see … whether the effect of th[e] payment was to make State money available to reimburse [providers] for a portion of the tax costs."  *In re Hawaii Department of Human Services Board*, 2005 WL 1540188, Decision No. 1981 (D.A.B. 2005).  Rather, the DAB explained, there must be a "legally enforceable" "guarantee" of indemnification by the governmental taxing unit.  *Id*. at *25.

In 2008, CMS adopted a regulation that largely restates the Act's third circumstance for hold-harmless provisions:

> The State (or other unit of government) imposing the tax provides for any direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or waiver directly or indirectly guarantees to hold taxpayers harmless for all or any portion of the tax amount.

42 C.F.R. § 433.68(f)(3) ("Hold-Harmless Rule").  In the preamble to that rule, CMS explained that it was concerned about "hold harmless arrangement[s] that may be *implemented by States*" and that the rule was "intended to … prohibit[] [federal funding] for health care-related taxes where *the state has implemented* a hold harmless provision."  *Medicaid Program; Health Care-Related Taxes*, 73 Fed. Reg.

---

[3] https://oig.hhs.gov/oas/reports/region7/70202097.pdf.

9,685, 9,690:2 (Feb. 22, 2008) (emphases added).  Accordingly, the preamble stated, "*States* will not be permitted to recycle monies through third parties, by making payments to such third parties and *requiring* that the money be used to reimburse taxpayers for any portion of their health care related tax." *Id.* at 9,694:2 (emphases added).  The preamble added that although a direct guarantee "does not need to be an explicit promise or assurance of payment," payments merely "influenced by the state" would not suffice—that was "too broad" a standard. *Id*. at 9,694:1–2.  Instead, "'*controlled or directed by the state*' is a more accurate description of the types of payments … considered in evaluating whether an impermissible hold harmless arrangement exists." *Id*. at 9,694:2 (emphasis added).

Also in 2008, an HHS OIG official testified that "private 'redistribution arrangement[s]'" among private providers do not "violate any hold harmless definition codified at § 1396b(w)(4)." *Texas*, 680 F. Supp. 3d at 805 (quoting Opening Br. for Appellant, *Kindred Hosps. E., LLC v. Sebelius*, 2012 WL 248356, at *55 (8th Cir. Jan. 9, 2012)).

Finally, in early 2019 the Director of CMS's Financial Management Group informed private healthcare providers that CMS "do[es] not have statutory authority to address" redistribution "agreements among providers [that] do not involve the state/local government and have not been shared with the state/local government," even if CMS does "not particularly like" them.  Doc. 1-10 at 1.  The Director added

that CMS did "not expect states to seek information about these agreements or providers to disclose these agreements to the state/local government in connection with CMS' questions." *Id*.

### D. CMS's Abandoned Rulemaking to Prohibit Private Redistribution Arrangements

Despite its long and firmly established position, in late 2019, CMS issued a notice of a proposed rule that would identify hold-harmless provisions based on an arrangement's expected effects. CMS proposed: a "direct guarantee will be found to exist where, considering the totality of the circumstances, the net effect of an arrangement between the State (or other unit of government) and the taxpayer results in a reasonable expectation that the taxpayer will receive a return of all or any portion of the tax amount." *Medicaid Program; Medicaid Fiscal Accountability Regulation*, 84 Fed. Reg. 63,722, 63,778:2 (Nov. 18, 2019). The proposal explained that such arrangements would be impermissible even if "a private entity makes the redistribution" independent of any state or local control or direction. *Id*. at 63,734:3– 63,735:1.

CMS's proposed change triggered significant backlash. More than ten thousand comments were submitted, many arguing that CMS "lacked statutory authority for its proposals." *Medicaid Program; Medicaid Fiscal Accountability Regulation*, 86 Fed. Reg. 5,105, 5,105:3 (Jan. 19, 2021). One such adverse comment was submitted by Daniel Tsai, then Massachusetts' Medicaid director, who wrote

10

that the proposed test "represents an unprecedented federal overreach" and "exceeds CMS' statutory authority." *Comments on Medicaid Program: Medicaid Fiscal Accountability Regulation* 2 [CMS2393-P] (Jan. 27, 2020) ("Tsai Letter").[4]  Based on this feedback, CMS withdrew the proposed rule in 2021.  86 Fed. Reg. at 5,105:1.

### E.  CMS's Issuance of an "Informational Bulletin" Adopting an Expected-Effect Test for the First Time

A few months after CMS withdrew its 2019 proposal, the same Daniel Tsai who opposed the effects test as "unprecedented federal overreach" was appointed Deputy Administrator of CMS.  On February 17, 2023, he issued on behalf of CMS an "informational bulletin" entitled "Health Care-Related Taxes and Hold Harmless Arrangements Involving the Redistribution of Medicaid Payments."  Doc. 1-7 (the "Bulletin").  The Bulletin declares that purely private redistribution arrangements (whether formal or informal, written or verbal) qualify as "direct" guarantees prohibited by section 1396b(w)(1)(A)(iii).

The Bulletin explains that "taxpayers appear to have entered into oral or written agreements (meaning explicit or implicit meeting of the minds, regardless of the formality or informality of any such agreement) to redirect or redistribute the Medicaid payments to ensure that all taxpayers receive all or a portion of their tax back."  Doc. 1-7 at 3.  "These redistribution payments may be made directly from

---

[4] https://www.regulations.gov/comment/CMS-2019-0169-1670.

one taxpaying provider to another, or the funds may be contributed first to an intermediary redistribution pool," i.e., made indirectly. *Id.* Such arrangements exist, the Bulletin notes, because "high-percentage Medicaid hospitals … still financially benefit from the tax program (even net of the redistribution payments they make to the lower Medicaid service volume hospitals), and the redistribution enables broad support for the tax program from all hospitals, ensuring constituent support for the state law authorizing the tax program." *Id.* at 4.

The Bulletin declares, without qualification, that such redistribution arrangements "constitute a prohibited hold harmless provision under section 1903(w)(4)(C)(i) of the Act and 42 C.F.R. § 433.68(f)(3)," Doc. 1-7 at 5, because they "result[] in a reasonable expectation that the taxpaying hospitals … are held harmless for at least part of their health care-related tax costs," *id.* at 3–4.  Further, the Bulletin states that if CMS determines there is such an arrangement within a State, CMS will not allow matching FFP for the associated tax revenue. *Id.* at 5 (CMS will "reduce a state's medical assistance expenditures by the amount of health care-related tax collections that include hold harmless arrangements, prior to calculating federal financial participation").  If CMS learns of the prohibited arrangement after paying the FFP, it will "disallow" the FFP, i.e., claw it back from the State. *See* 42 U.S.C. § 1396b(d)); 42 C.F.R. §§ 430.42, 431.958.

The Bulletin requires States to collect information from private providers about their arrangements and report it to CMS, and to police private providers' conduct to ensure they do not have redistribution arrangements (whether formal or informal). The Bulletin states that CMS "intends to inquire about potential redistribution arrangements and may conduct detailed financial management reviews of health care-related tax programs that appear to include redistribution arrangements or that CMS has information may include redistribution arrangements." Doc. 1-7 at 5. Consequently, the Bulletin states, CMS "expect[s] states to have detailed information available regarding their health care-related taxes" and requires States "to make available all requested documentation regarding arrangements involving possible hold harmless arrangements and the redistribution of Medicaid payments." *Id*. Brushing aside States' "cited challenges with identifying and providing details on redistribution arrangements because they may not be parties to the redistribution agreements," the Bulletin declares: "states should make clear to their providers that these arrangements are not permissible under federal requirements, learn the details of how health care-related taxes are collected, and take steps to curtail these practices if they exist." *Id*. The Bulletin also promises a stiff penalty for States that fail to comply with these duties: the "deferral or disallowance" of the State's FFP. *Id*.

**F.    CMS's "Financial Management Review" of Florida's LPPFs**

Five days after releasing the Bulletin, CMS sent AHCA a letter informing it that CMS was commencing a Financial Management Review ("FMR") of Florida's LPPFs—and demanding that AHCA ensure Florida-based providers comply with the Bulletin's new policy or else lose the associated FFP.  Doc. 1-8 ("FMR Letter"). The FMR Letter said that "Florida's LPPF tax structure and media reports indicate that the Florida LPPF arrangement" may involve "pre-arranged agreements to redirect Medicaid payments away from Medicaid providers serving a high percentage of Medicaid beneficiaries to hospitals that do not participate in Medicaid or that serve a low percentage of Medicaid beneficiaries," which would "violate federal requirements."  Doc. 1-8 at 1.

The FMR Letter demanded that AHCA answer voluminous questions regarding the LPPFs, including detailed questions about the existence of any redistribution arrangement among private providers.  Doc. 1-8 at Attachment pp.1–3.  The FMR Letter also demanded that AHCA "describe what oversight the state conducts to ensure the use of LPPF revenue as a source of non-federal share meets federal requirements."  *Id*. at Attachment p.3.  Finally, the letter noted that AHCA's failure to comply with CMS's requests "may result in a deferral or disallowance of" FFP.  *Id*. at Attachment p.1.

14

### G.    The Preliminary Injunction of CMS's New Policy in Texas

The State of Texas challenged the Bulletin in federal district court in Texas, arguing that the novel policy announced in the Bulletin is contrary to law because it conflicts with the Act, is arbitrary and capricious because it reflects an unexplained change in position, and is procedurally invalid because it was issued without notice-and-comment rulemaking. Texas moved for a preliminary injunction. CMS argued that the court lacked jurisdiction to adjudicate Texas's claims because the Bulletin was not final agency action, Texas's claims were unripe, and 42 U.S.C. § 1316(e) barred judicial review under *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). *Texas*, 680 F. Supp. 3d at 802.

The *Texas* court rejected CMS's jurisdictional challenges and concluded that the preliminary-injunction factors were met. *Texas*, 680 F. Supp. 3d at 802–11. First, the court determined that Texas's claim that the Bulletin conflicts with the Act was likely to succeed because, by "condition[ing] a state's Medicaid funding on private agreements over which states have no knowledge or control," the Bulletin "decouples the 'grammatical link' found in the statute" "between *the government*, as the actor providing for something, and *a guarantee*, as the thing provided for." *Id.* at 808.[5] Next, the court found that "Texas's compliance costs are irreparable

---

[5] All quotation marks and alterations have been omitted from quoted text unless otherwise indicated.

because CMS is immune from monetary damages" and that the public's interest favored avoiding "unlawful agency action" and maintaining "state Medicaid programs." *Id.* at 809–11. Consequently, the court preliminarily enjoined the federal government from "implementing or enforcing the Bulletin," "from otherwise enforcing an interpretation of the scope of 42 U.S.C. § 1396b(w)(4)(C)(i) found therein," and "from relying on the Bulletin for any purpose during the pendency of th[e] litigation." *Id.* at 811.

On August 3, 2023, the court clarified that its injunction is limited to the State of Texas. Order Denying Mot. to Clarify at 1–2, *Texas*, No. 23-cv-161 (E.D. Tex. Aug. 3, 2023), Doc. 40.

## II.    PROCEEDINGS BELOW

About two weeks after the *Texas* court clarified that its order was limited to the State of Texas, Florida sued CMS and other federal defendants (collectively, "CMS"), asserting: the Bulletin is contrary to the Act and the Constitution's Spending Clause, is arbitrary and capricious because it is an unexplained change in position, and was impermissibly issued without notice-and-comment rulemaking. Doc. 1. Florida moved to preliminarily enjoin CMS "from enforcing, implementing, or otherwise relying on the Bulletin and the policy and interpretation it announces to conduct any audit or review, including the pending Financial Management Review of Florida, or to defer, reduce, or disallow any Medicaid funding for

Florida." Doc. 10 at 20 ("PI Motion"). In opposition to the PI Motion, and in a subsequent motion to dismiss under Rule 12(b)(1), CMS argued the court lacked jurisdiction for the same reasons rejected in *Texas*. Doc. 22; Doc. 40. The district court here referred both motions to a magistrate judge for a report and recommendation ("R&R").

The magistrate judge recommended dismissing the Complaint and denying the PI Motion on the theory that neither the Bulletin nor the FMR is final agency action. Doc. 48. The R&R deemed the Bulletin not final because "it does not itself affect Florida's rights without CMS taking future administrative action," namely disallowing FFP. *Id.* at 10–15. And the R&R concluded that the FMR is not final because it "merely serves to investigate Florida's LPPF tax program." *Id.* at 8–10.

Florida timely objected to the R&R, Doc. 49, but the district court adopted the R&R in full, denied Florida's PI motion, and granted CMS's motion to dismiss, Doc. 53 at 2.

## III.  SUBSEQUENT ADMINISTRATIVE DEVELOPMENTS

On April 22, 2024, CMS took two actions relating to the policy announced in the Bulletin. First, CMS finalized a new regulation specifying that States "must … [e]nsure that providers receiving payment under a State directed payment attest that they do not participate in any hold harmless arrangement for any health care-related tax as specified" in CMS's 2008 Hold-Harmless Rule. *Medicaid Program;*

*Medicaid and Children's Health Insurance Program (CHIP) Managed Care Access, Finance, and Quality*, 89 Fed. Reg. 41,002, 41,269:1 (published May 10, 2024) (to be codified at 42 C.F.R. § 438.6(c)(2)(ii)(H)(*1*)).   In the preamble, CMS acknowledged that the policy announced in the Bulletin prohibits "hold harmless arrangements … that produce a reasonable expectation that taxpaying providers will be held harmless for all or a portion of their cost of a health care-related tax," *id.* at 41,077:1, irrespective of the "degree[] of State awareness and involvement" in the arrangement, *id.* at 41,075:1.   *See also id.* at 41,075:3–41,076:1.   Indeed, the Bulletin's adoption of that policy was the reason CMS then adopted the attestation requirement in 2024: given that States may lack awareness of and involvement in such arrangements, States could not describe them in their applications to CMS and accordingly CMS could not ensure that States' proposed plans complied with the Bulletin's new policy. *Id.* at 41,075:2–41,076:1. The attestation requirement takes effect on January 1, 2028. *Id.* at 41,004, Table 1.

Concurrently, CMS issued another informational bulletin, entitled "Exercise of Enforcement Discretion until Calendar Year 2028 for Existing Health Care-Related Tax Programs with Hold Harmless Arrangements Involving the Redistribution of Medicaid Payments" ("Supplemental Bulletin").[6]   In the

---

[6]   https://www.medicaid.gov/federal-policy-guidance/downloads/cib042224.pdf.

Supplemental Bulletin, CMS announced that, as a matter of "enforcement discretion," it "will not enforce" the Bulletin's policy based on *existing* private redistribution arrangements until January 1, 2028—the effective date of the new rule-based attestation requirement. Supp. Bulletin at 1; *see id.* at 3. But CMS will immediately begin applying the Bulletin's policy to "disapprov[e] … state Medicaid payment proposals and/or disallow[]" FFP based on "any *new* provider payment redistribution arrangements about which [CMS] may learn." *Id.* at 3 (emphasis added).

The Supplemental Bulletin explained that CMS is deferring implementation with respect to preexisting private redistribution arrangements to give States time to take steps now to comply with the Bulletin's policy, lest States suffer the disastrous penalty of immediate disallowance of FFP. Like the 2024 rule's preamble, the Supplemental Bulletin "acknowledge[d] that states have varying degrees of awareness and involvement in" the private arrangements prohibited by the Bulletin, and that "coming into compliance with [the Bulletin] may involve coordination among state agencies, state legislatures, providers and provider groups." Supp. Bulletin at 2, 4. Therefore, CMS recognized, immediate enforcement of the Bulletin's policy with respect to preexisting arrangements could "result in unanticipated and significant Medicaid program disruption." *Id.* at 1. Indeed, CMS stated: "We understand that the immediate elimination of a source of non-Federal

share for Medicaid expenditures"—stemming from the immediate application of the Bulletin's policy to existing private redistribution arrangements—"has the potential to result in state budget shortfalls, potentially leading to reductions in payments that could contribute to solvency issues for providers, including safety net providers, and thereby have an adverse effect on beneficiaries (especially those in underserved communities)." *Id.* *See also* 89 Fed. Reg. at 41,073:2 ("Health care-related taxes … are a critical source of funding for many States' Medicaid programs, including for supporting … payments to safety net providers.").

The Supplemental Bulletin made clear, however, that States may not idle in the meantime. Rather, "[d]uring the period before January 1, 2028, [CMS] expect[s] states with existing hold harmless arrangements to undertake changes necessary so that by no later than January 1, 2028, the state is compliant with all non-Federal share financing requirements." Supp. Bulletin at 3. That includes "proactively modify[ing] the payments or source of non-Federal share associated with [private redistribution] arrangements before that date." *Id.*; *see id.* ("CMS expects states to transition away from existing provider payment redistribution arrangements and not develop reliance on new redistribution arrangements.").

## IV.    STANDARD OF REVIEW

This Court reviews dismissal under Rule 12(b)(1) *de novo*. *Resnick v. KrunchCash, LLC*, 34 F.4th 1028, 1033 (11th Cir. 2022). "[T]he denial of a

preliminary injunction is reviewed for abuse of discretion, but the underlying legal conclusions are reviewed *de novo*." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1229 (11th Cir. 2019). "An error of law is an abuse of discretion *per se*." *Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145, 1153 (11th Cir. 2019).

## SUMMARY OF ARGUMENT

The novel hold-harmless policy announced in the Bulletin is final, firm, and unlawful, and Florida's challenge to it should proceed. The district court's contrary conclusion casts aside more than a half century of settled administrative law permitting pre-enforcement review of agency rules and must be reversed.

The Bulletin is final because it satisfies both requirements for finality. *First*, by CMS's own admission, it articulates a "firm" view of the Act's hold-harmless prohibition. *Second*, the Bulletin determines Florida's rights and obligations, saddling Florida with novel and costly policing and reporting requirements, all enforced by the threat of losing billions of dollars in federal funding. Yet the district court, ignoring *Abbott*'s longstanding rule permitting pre-enforcement challenges, found that the Bulletin's effects on Florida were contingent on whether CMS in the future decides that Florida's funding system involves a prohibited hold-harmless provision and consequently disallows Florida's federal funding. That conclusion is not only incorrect—Florida must comply *now* with the Bulletin's policing and

21

reporting requirements irrespective of any enforcement proceeding—but also misapprehends the nature of this lawsuit. Here, Florida challenges the Bulletin's policy, not its application in a specific administrative proceeding.

The remaining issues are purely legal, and this Court should address them now. Specifically: Florida's facial challenge to the Bulletin is ripe; *Thunder Basin* does not require Florida to channel its challenge through CMS's administrative regime because to do so would deprive the State of meaningful review; and Florida is entitled to a preliminary injunction because the Bulletin's policy violates the Act and the APA, jeopardizing key healthcare funding.

## ARGUMENT

## I.  THE DISTRICT COURT ERRED IN DISMISSING FOR LACK OF FINAL ACTION

### A.  The Bulletin Is Final Action

#### 1.  *The Bulletin Is Final Because It Announces a Rule to Which Florida Must Conform Now, to Florida's Detriment*

**a.** It is well-settled that "agency statement[s] of … future effect," 5 U.S.C. § 551(4)—like the Bulletin—are final and subject to pre-enforcement review immediately upon their issuance. The Supreme Court "normally do[es] not require plaintiffs to bet the farm … by taking the violative action before testing the validity of the law." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 490 (2010). The Court has "long held" that "parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of serious criminal and

civil penalties." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 600 (2016).  Rather, ever since *Abbott*, the rule has been that "[w]hen … the expected conformity to [an administrative rule] causes injury cognizable by a court of equity"—as rules invariably do with respect to the directly regulated actor—"they are appropriately the subject of attack" by that actor upon their issuance.  *Abbott Laboratories*, 387 U.S. at 150–52.  That is so even though the agency might enforce a rule against the challenger in a separate proceeding, for *Abbott* "expand[ed] the opportunities for judicial review by allowing *both* facial, pre-enforcement challenges *and* as-applied challenges to agency action … in enforcement actions."  *PDR Network, LLC*, 588 U.S. at 16 (Kavanaugh, J., concurring, joined by Thomas, Alito, and Gorsuch, JJ.).

In short, when an agency action leaves an actor with a Hobson's Choice of incurring burdensome compliance or a penalty for noncompliance, the action is final action and subject to pre-enforcement review.  *See, e.g.*, *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1280 (11th Cir. 2007) (order was "final agency action" because plaintiff "must pay the premiums" under the order "or incur the penalties for failure to make those payments").

**b.**    To be final, agency action must meet two requirements:  "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second, the action

must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Hawkes Co.*, 578 U.S. at 597.

The Bulletin is final action because it both marks the consummation of the agency's decisionmaking process and subjects Florida to legal consequences. The Bulletin imposes on Florida a highly undesirable Hobson's Choice: conform to the Bulletin by ensuring, at significant expense to the State, that there are no private redistribution arrangements in the State or lose billions of dollars in FFP annually. Doc. 10-1 ¶¶ 36, 38.

The first finality requirement is undisputedly met: both here and in *Texas*, CMS has conceded that the Bulletin provides a "clear understanding of [CMS's] interpretation of the federal requirements for health care-related taxes." Doc. 40 at 11; *Texas*, 680 F. Supp. 3d at 805 (noting CMS's admission that "the Bulletin takes a 'firm' view on the legality of private reimbursement arrangements"). CMS's 2024 rulemaking and Supplemental Bulletin confirm that CMS adopted a firm, final policy through the Bulletin and concluded the agency's consideration of the issue. As described above, the 2024 regulation was adopted to facilitate CMS's enforcement of the Bulletin's policy, *supra* p.17–18, and the Supplemental Bulletin states that CMS will immediately enforce the Bulletin's policy as to new private redistribution arrangements, *supra* p.19.

24

As to the second finality requirement, the Bulletin imposed new substantive obligations on Florida and immediately put Florida to a Hobson's Choice: comply with those new obligations or lose billions of dollars in federal healthcare funds. First, the Bulletin announces a substantive rule for determining whether certain private arrangements disqualify state funds for federal matching: "agreements" among private "taxpayers … to redirect or redistribute the Medicaid payments to ensure that all taxpayers receive all or a portion of their tax back … constitute a prohibited hold harmless provision under section 1903(w)(4)(C)(i) of the Act" because they "result[] in a reasonable expectation that the taxpaying hospitals … are held harmless for at least part of their health care-related tax costs." Doc. 1-7 at 3–5. If such arrangements are identified, the Bulletin continues, CMS will "reduce a state's medical assistance expenditures by the amount of health care-related tax collections that include hold harmless arrangements, prior to calculating federal financial participation." *Id.* at 5. The Bulletin repeatedly declares that CMS will enforce its policy by disallowing matching on state funds raised through a program with such a prohibited hold-harmless provision. *See id.* at 2–3, 5.

Next, the Bulletin expressly imposes new informational and policing duties on States. *See supra* p.13. The Bulletin commands States to "make clear to their providers that these arrangements are not permissible under federal requirements, learn the details of how health care-related taxes are collected, and take steps to

curtail these practices if they exist." Doc. 1-7 at 5. And the Bulletin requires States "to make available all requested documentation regarding arrangements involving possible hold harmless arrangements and the redistribution of Medicaid payments," and "expect[s] states to have detailed information available regarding their health care-related taxes." *Id*. Accordingly, the FMR Letter demanded that AHCA supply detailed information regarding the existence and structure of the LPPFs, the activity of the private hospitals participating in the LPPFs, and any redistribution arrangements among the hospitals (which could include through any intermediaries). Doc. 1-8 at 1–3.

Complying with these informational and policing duties will be costly for Florida. According to undisputed testimony, AHCA will have to conduct a "full examination of the financial expenditures of every single hospital subject to an assessment to determine whether a direct or indirect relationship might exist between Medicaid payments and some payment, contract, or other financial transaction with another hospital." Doc. 10-1 ¶¶ 29, 35–36. That includes "investigat[ing] and assess[ing] … healthcare providers' contractual arrangements" and "evaluat[ing] whether the relationship constitutes an impermissible hold-harmless arrangement under the Bulletin." *Id.* ¶¶ 29, 31. Florida's investigation would also necessarily "extend to any individual who receives remuneration from a hospital participating in an LPPF—including employees or contractors of the hospital—to determine if the

individual then used those funds at a second hospital." *Id.* ¶ 30.  And Florida would need to "take action to 'curtail' the arrangement, presumably by prohibiting the hospital from maintaining the business agreement," such as by "requir[ing] the hospital … to cancel the contract at issue and recover or return expended Medicaid funds." *Id.* ¶¶ 29, 31.

All this will be challenging for Florida because Florida "has never conducted the type of investigations or enforcement action the Bulletin requires," and so the State would need to establish a new oversight apparatus.  Doc. 10-1 ¶ 33.  Because existing Medicaid oversight resources, skills, and experience would not be useful in policing private redistribution arrangements, Florida would have to substantially beef-up its staffing—including professional auditors, financial examiners, financial analysts, and lawyers—by training and redeploying existing staff, hiring new staff, contracting with third parties, or some combination thereof.  *Id.* ¶¶ 33–34, 36.  This new oversight apparatus would likely need to be quite large given that more than 200 private hospitals—each of which has vast and complex operational structures—currently participate in the DPP through LPPFs.  *Id.* ¶¶ 35–36.  Consequently, new and existing AHCA personnel would need to spend "thousands of hours" annually on this oversight, at a yearly cost of at least $1.5 million.  *Id.* ¶¶ 34–36.

Yet, the Bulletin makes clear that if Florida fails to comply with these informational and policing duties, Florida will suffer the severe penalty of "deferral

27

or disallowance" of FFP—separate and apart from disallowance based on the existence of a prohibited hold-harmless provision.  Doc. 1-7 at 5; *see* Doc. 1-8 at Attachment p.1.  Disallowance would cost the State billions of dollars in federal funding.  *See supra* p.6.  Deferral would be almost as bad—even if it did not result in disallowance—because in the meantime providers would have to plan their operations as if they would not receive those funds.  Doc. 10-1 ¶ 39.

CMS's 2024 rulemaking and Supplemental Bulletin confirm that the Bulletin has immediate adverse consequences for States.  *See supra* pp.17–20.  The Supplemental Bulletin states that CMS will immediately begin applying the Bulletin's policy to "disapprov[e] … state Medicaid payment proposals and/or disallow[]" FFP based on "any new provider payment redistribution arrangements about which [CMS] may learn."  Supp. Bulletin at 3.  And although CMS deferred enforcement of the Bulletin's policy with respect to preexisting private redistribution arrangements, *id.* at 1, 3, and of the 2024 regulation's attestation requirement, 89 Fed. Reg. at 41,269:1, 41,004, Table 1, the Supplemental Bulletin declares that States must be fully compliant "no later than January 1, 2028," Supp. Bulletin at 3.  To achieve that, States must "proactively" begin "transition[ing] away" from funding sources prohibited by the Bulletin "[d]uring the [deferral] period," *id.*, and accordingly States must now begin implementing the necessary oversight structures to ensure timely and continued compliance with the Bulletin's policy by 2028.

28

**c.**     The Sixth Circuit's recent decision in *State of Tennessee v. Department of Education*, 104 F.4th 577 (6th Cir. 2024), is highly instructive here.  The Sixth Circuit held that three documents issued by the Department of Education announcing its policy on sex discrimination—a "Notice of Interpretation," a "Dear Educator" letter, and a "Fact Sheet"—were final and subject to pre-enforcement review.  *Id.* at 586, 598–601.  The court explained that, like the Bulletin, the documents there "force [States] either to alter their conduct, or expose themselves to potential liability.… So States will risk losing their federal funding if they continue to run their educational institutions in accordance with their own laws and policies."  *Id.* at 600.  To "avoid liability," the challenged documents also declared—again like the Bulletin—that States "have a responsibility to investigate and address discrimination" that violates the new policy.  *Id.* at 599.  The court added that "whether the Documents determine the outcome in any particular case is irrelevant to [its] inquiry (particularly on pre-enforcement review)."  *Id.* at 601.

## 2.     *The District Court's Analysis Is Incorrect*

**a.**     The district court principally reasoned that the Bulletin is not final action because it "only affects [Florida's] rights adversely on the contingency of future administrative action," namely, a CMS decision disallowing FFP based on a finding that there are prohibited hold-harmless arrangements in Florida.  Doc. 48 at 10–12.  But this suit does not seek to challenge or pretermit a specific enforcement

29

action against Florida; this is a pre-enforcement facial challenge to the Bulletin and policy announced therein, and therefore the suit is justiciable now even if there might be a specific adverse enforcement action later, in a separate proceeding. The district court's reasoning flouts the well-settled rule, described above, that agency actions are subject to *both* pre-enforcement facial challenge *and* as-applied challenge during an enforcement proceeding.

The cases relied upon by the district court (*see* Doc. 48 at 10–11) do not suggest otherwise—nor could they, given that binding Supreme Court precedent recognizes the propriety of pre-enforcement facial challenges to agency rules. Rather, the kind of contingency those cases were concerned with corresponds to the *first* prong of the final-action test, which is concededly satisfied here, *supra* p.24. For example, in *National Parks Conservation Ass'n v. Norton*, the agency "ha[d] done nothing beyond establishing a committee to review alternatives, … formulating management options and submitting those plans for public comment." 324 F.3d 1229 (11th Cir. 2003). Therefore, this Court held that the challenged actions could not "be deemed the consummation of [the agency's] decisionmaking process" because "one of the four proposed management alternatives" had not yet been "selected and implemented." *Id.* at 1238, 1240. Similarly, in *DRG Funding Corp. v. Secretary of HUD*, the D.C. Circuit determined that an agency's decision not to dismiss an administrative proceeding was "interlocutory"—"a provisional ruling …

that does not end the controversy"—just "like a district court's denial of a motion to dismiss" is interlocutory and unreviewable. 76 F.3d 1212 (D.C. Cir. 1996). That was the sense in which the agency action's effect was "contingent." *Id.*

**b.** The district court also repeatedly misapprehended the Bulletin's immediate significance for Florida. First, the court asserted that "the conclusion of the FMR could moot Florida's concerns" because "CMS could conclude that Florida's LPPF tax program does not contain impermissible hold-harmless arrangements." Doc. 48 at 13. But again, the court's analysis disregards the well-settled rule that a regulated actor may bring a pre-enforcement facial challenge even if it might later prevail in an enforcement proceeding. *Supra* pp.22–23. The court's analysis also ignores the fact that, regardless of what CMS might later conclude about Florida's LPPFs, the Bulletin imposes immediate and costly informational and policing obligations on Florida, which come with their own risk of penalty for noncompliance. *Supra* pp.25–28.[7]

Second, the district court described the Bulletin as hortatory, presenting mere "recommendations or expectations for a potential inquiry or request for documents." Doc. 48 at 11. That is inaccurate and notably not an argument raised by CMS. The

---

[7] The court also asserted that "CMS could determine that Florida's LPPF tax program contains impermissible hold-harmless arrangements under what Florida considers CMS's old position on hold-harmless arrangements." Doc. 48 at 13. But CMS has not suggested that any putative redistribution arrangement in Florida would be a prohibited hold-harmless provision but for the Bulletin's new policy.

Bulletin states expressly that States are subject to mandatory duties to collect information from private providers and to supply that information to CMS on demand, on pain of disallowance, *supra* p.13, as confirmed by CMS's 2024 actions, *supra* pp.19–20.

Third, the district court concluded that Florida "does not face or allege a serious risk of penalties while awaiting the conclusion of CMS's FMR." Doc. 48 at 13. Not true. The Bulletin expressly states that if Florida fails to comply with the Bulletin's informational and policing obligations, Florida faces the loss of billions of dollars in Medicaid funding. *See supra* p.6. Yet, the district court deemed that massive loss insufficient on the theory that the threat of disallowance "relates to … the past two fiscal years and potentially the current fiscal year," not any future years. Doc. 48 at 14. That analysis is baffling. If Florida does not comply with the Bulletin *now or anytime in the future*, it faces the loss of FFP for the corresponding year. Moreover, a clawback of past FFP would obviously be costly and painful for Florida, providers, and their patients, because the State would still have to come up with the funds to return to CMS, causing providers to reduce their future Medicaid services. Doc. 10-1 ¶ 39. Regardless, the potential disallowance of FFP is unnecessary to show finality; Florida's conformity with the Bulletin's informational and policing requirements will be costly, *supra* pp.26–27, and that alone makes the Bulletin final

action, *see, e.g.*, *Abbott Laboratories*, 387 U.S. at 152 (action final if it has "immediate" and "direct effect" on regulated party's "day-to-day" affairs).

Fourth, the district court asserted that the Bulletin's informational duties do not "exceed what has previously been established to not constitute final agency action." Doc. 48 at 11. Even if correct, that would not defeat finality because it overlooks the Bulletin's additional *policing* requirements. Regardless, the court misconstrued the cases it cited, all of which involved informational duties of "part[ies] … participat[ing] in an agency proceeding." *Aluminum Co. of Am. v. U.S.*, 790 F.2d 938, 941–43 (D.C. Cir. 1986); *accord F.T.C. v. Standard Oil Co. of Cal.*, 449 U.S. 232, 242 (1980); *CEC Energy Co. v. Pub. Serv. Comm'n of Virgin Islands*, 891 F.2d 1107, 1111–12 (3d Cir. 1989). In contrast, the Bulletin's informational duties apply irrespective of any administrative proceeding.

Fifth, the district court dismissed the Bulletin's informational burdens on the theory that CMS "has the statutory and regulatory authority to request documents from states regarding their Medicaid funding programs" even without the Bulletin. Doc. 48 at 11 n.1; *see id.* 14–15. Again, that is irrelevant because it overlooks the Bulletin's *policing* duties. It is also incorrect. One cited authority requires States to make reports about their Medicaid programs and to supply supporting information, 42 U.S.C. § 1396a(a)(6); another requires access to information needed to "audit" a State's program, 45 C.F.R. § 75.364; and the third requires reporting of the "source

and use" of "health care-related taxes collected" and "related" information, 42 C.F.R. § 433.74. None require States to collect or report information about purely private financial arrangements or about *permissible* conduct—as private arrangements would be absent the Bulletin—on pain of disallowance.[8]

Finally, in a cursory footnote, the district court stated that *Texas* was distinguishable "based on the circumstances surrounding Florida's challenge of the Informational Bulletin." Doc. 48 at 15 n.2. That unelaborated conclusion is unsound. Both Texas and Florida are subject to the same obligations under the Bulletin, and both are advancing substantially the same facial challenges to the rule announced in the Bulletin. Therefore, it is irrelevant that CMS is using different investigative modes in each state (an FMR in Florida, an OIG investigation in Texas). Indeed, the Bulletin declares that CMS "will take enforcement action" based on the findings of *any* "oversight agency," not just its own FMR process. Doc. 1-7 at 5.

### 3.    *The Bulletin Announced a New Policy; It Did Not Reiterate a Preexisting One*

In the district court, CMS argued that the second finality prong is not satisfied because legal consequences to Florida flow not from the Bulletin but from a

---

[8] Even if these authorities were ambiguous on the issue, that would not suffice because States are subject to only those Medicaid duties that are *unambiguously* established *by statute*. *See infra* p.52.

preexisting policy that the Bulletin "merely reiterate[d]."  Doc. 40 at 8.  CMS's story has no support.  As detailed above, *supra* pp.7–10, across the OIG's 2003 Report, the DAB's 2005 *Hawaii* decision, CMS's 2008 rulemaking, OIG's 2008 testimony, and a 2019 email from the head of CMS's Financial Management Group, HHS and CMS consistently "disclaimed any intention to disallow state funding for these private arrangements" before issuing the Bulletin.  *Texas*, 680 F. Supp. 3d at 805.  As the Bulletin's author stated just a few years before its issuance, the proposition that private redistribution arrangements qualify as prohibited direct guarantees was "unprecedented."  Tsai Letter at 2.

     **a.**     In support of its revisionist history, CMS claimed that it adopted the Bulletin's policy through the 2008 Hold-Harmless Rule.  But the *regulation* adopted in 2008 says nothing of the sort, *see* 42 C.F.R. § 433.68(f)(3), as CMS conceded by relying only on the preamble, Doc. 40 at 9.  The preamble, of course, cannot impose a legal requirement that is not in the regulation itself.  *See Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999); *Blanco v. Samuel*, 91 F.4th 1061, 1076 n.14 (11th Cir. 2024)  (declining to assign "controlling weight" to rule's preamble "that has not been through notice and comment").  Moreover, CMS's claim is belied by its conduct: CMS would not have commenced a rulemaking in 2019 to adopt this policy if it had already done so through the 2008 rule.

Regardless, CMS grossly distorts the 2008 preamble.  CMS emphasized the preamble's instruction that the hold-harmless prohibition "be applied flexibly" and "must consider … non-Medicaid payments," Doc. 40 at 9 (quoting 73 Fed. Reg. at 9,690–9,691), but both phrases are equally consistent with Florida's reading of the preamble.  And the preamble's discussion of "reasonable expectation" reflected a very different concept from the one adopted in the Bulletin: the phrase was adopted to ensnare *State*-created reimbursement mechanisms that were not "overt," such as "state laws providing grants" to the taxpayers.  73 Fed. Reg. at 9,694:3.  Nothing in the preamble indicated CMS intended the phrase to catch purely private redistribution arrangements.  *Id*.  *See also id.* at 9,686.  To the contrary, the preamble explicitly stated "'influenced by the state' is too broad" and "'controlled or directed by the state' is a more accurate description" of the redistribution arrangements that CMS prohibits.  *Id.* at 9,694:1–2.

CMS also contends that it adopted the 2008 rule "in part to make clear that the [DAB's 2005 *Hawaii*] conclusion was in error."  Doc. 40 at 4.  But the 2008 preamble described *Hawaii* as permitting programs that "States had created" and that were "designed *by the States* to compensate … for the costs of the tax," and the preamble said CMS thought the DAB was wrong *to that extent*.  73 Fed. Reg. at 9,685:3–9,686:1 (emphasis added).  That rejection does not undermine the portion of the DAB's decision that required a "legally enforceable" "guarantee" of

indemnification by the governmental taxing unit, *Hawaii*, 2005 WL 1540188 at *25, or otherwise indicate that CMS in 2008 intended purely private redistribution to qualify as a direct guarantee. On the contrary, as noted above, the 2008 preamble *agreed* with the DAB on that point, explaining that "'influenced by the state' is too broad." 73 Fed. Reg. at 9,694:1–2.

**b.** Next, CMS relied on the 2019 proposed regulation. Doc. 40 at 9–10. However, "[i]t goes without saying that a *proposed* regulation does not represent an agency's considered interpretation of its statute." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 845 (1986) (emphasis added). Judging an agency's "'[]consistency'" based on "a proposal that it has not firmly decided to put into effect and that it subsequently reconsider[ed] in response to public comment" would be "antithetical" to the APA. *Id*.

**c.** Next, CMS asserted—without explanation—that the 2019 Director email was "ambiguous." Doc. 40 at 11. The email is clear: the Director was asked to "confirm" that CMS "do[es] not have statutory authority to address" redistribution "agreements among providers [that] do not involve the state/local government and have not been shared with the state/local government," and the Director replied, "This is accurate." Doc. 1-10 at 1. CMS cited *Alfa Int'l Seafood v. Ross*, but unlike here, the party there mistakenly placed its "stock in a lone e-mail communication"

37

from an agency official that contradicted the position adopted by the agency in a duly promulgated rule.  264 F. Supp. 3d 23 (D.D.C. 2017); *see* Doc. 40 at 11.

    **d.**    Finally, CMS faulted Florida for "not point[ing] to any … conversations between CMS and Florida" like the one Texas cited in its case, wherein CMS told Texas in 2019 "that so long as neither the State nor unit of local government was providing the guarantee, there is not a prohibition on such private business arrangements."  Doc. 40 at 10.  CMS's implication—that CMS had one statutory interpretation and policy for Texas and a different position for Florida—is preposterous and betrays the weakness of its position in this case.  Indeed, CMS's reassurance to Texas in 2019 is yet another piece of evidence *confirming* that the Bulletin *changed* CMS's policy—and it is just as indicative of that change on one side of the Gulf of Mexico as on the other.  *See Texas*, 680 F. Supp. 3d at 805.

##     B.    The District Court Erroneously Relied on the FMR

    The district court's separate conclusion that the FMR is not final action, Doc. 48 at 8–10, misconstrues Florida's challenge and the relief Florida seeks.  Florida challenges *the rule announced in the Bulletin* and the statutory interpretation on which that rule is based, and accordingly seeks an injunction barring application or enforcement of that policy or underlying interpretation, whether through the FMR or otherwise.  *See* Doc. 1 at 20, 25–26; *supra* pp.16–17.  *See also Texas*, 680 F. Supp. 3d at 811 (granting such relief to Texas).  Thus, the pertinent question is not whether

the FMR is final action, but whether the policy on which the FMR rests—the policy CMS adopted through the Bulletin—is final action.

The district court acknowledged the relationship between the Bulletin's policy and the FMR but mistakenly concluded that it shows that "Florida apparently has no issue with being investigated." Doc. 48 at 10. That inference is obviously incorrect. This lawsuit shows that Florida *does* object to being investigated with respect to potential violations of the Bulletin's unlawful policy. As explained above, CMS cannot investigate Florida—under threat of disallowance—for conduct that is prohibited only under the Bulletin's invalid policy. *Supra* pp.33–34.

## II. THIS COURT SHOULD REJECT CMS'S OTHER JURISDICTIONAL ARGUMENTS

In this section and the next, Florida addresses (i) CMS's other jurisdictional objections and (ii) the arguments in favor of a preliminary injunction. The district court did not reach these issues, but they are "the exact type of issue[s] that can and should be decided by the appellate court in the first instance." *Kerr for Kerr v. Comm'r of Soc. Sec.*, 874 F.3d 926, 933 (6th Cir. 2017). The record is complete; these issues are "purely legal" (including with respect to the issue of irreparable injury, which depends on undisputed facts); this Court's "answer[s] … [are] integral to the outcome of this litigation"; "the issues have been [or could be] clearly and thoroughly briefed and argued before" this Court; and "remand would not be in the interest of judicial economy because either party would almost certainly appeal an

adverse decision by the district court and [this Court] would eventually be called upon to address these very issues." *Id.  See also, e.g.*, *Boyes v. Shell Oil Prod. Co.*, 199 F.3d 1260, 1266 n.13 (11th Cir. 2000) (deciding "purely legal issue" in first instance because "[t]here are no subsidiary factual issues that need to be decided[,] the record is as developed as it will ever be …, and a remand would unnecessarily delay the disposition of [the] case").  Finally, the central issue in this case—the validity of the Bulletin's policy prohibiting private redistribution arrangements—could affect billions of dollars in Medicaid funding for millions of Floridians. Prompt disposition of this case is imperative because, until this issue is decided, the State's ability to accurately plan its Medicaid budgets and operations will be impaired.

### A.    Florida's Claims Are Ripe

CMS contended below that Florida's challenge to the Bulletin is unripe because: (1) "CMS has not yet made any determination regarding whether the tax arrangements in Florida violate the relevant statute and regulations"; and (2) the Bulletin "merely clarifies [CMS's] understanding of the relevant law."  Doc. 40 at 19–20.

The first point is irrelevant and the second is incorrect. *Supra* pp.29–30, 34–38.[9] As *Texas* recognized, 680 F. Supp. 3d at 804, the challenge to the Bulletin is a "purely legal" pre-enforcement facial challenge to a final action that "purport[s] to give an authoritative"—and unprecedented—"interpretation of a statutory provision that has a direct effect on the day-to-day business of" Florida and thereby places Florida "in a dilemma": "Either [Florida] must comply with the [Bulletin's] requirement[s] and incur the costs of [doing so] or [Florida] must follow [its] present course and risk" the loss of billions in federal matching dollars, *Abbott Laboratories*, 387 U.S. at 149–54. *Accord, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167–68 (2014); *cf. Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 810, 812 (2003) (challenge to agency interpretation unripe because it left petitioner "free to conduct its business as it sees fit" and real dispute concerned interpretation's application to "particular" situations).

### B.    Section 1316(e) Does Not Preclude Judicial Review

Invoking the *Thunder Basin* doctrine, CMS asserted below that Congress precluded district courts from exercising jurisdiction over Florida's challenge and instead channeled it into the process for adjudicating Medicaid funding disallowances prescribed by 42 U.S.C. § 1316(e).  Doc. 40 at 15–19.  Yet, "pre-

---

[9] Finality is a principal component of ripeness, *Abbott Laboratories*, 387 U.S. at 148–49, and CMS intermingled other ripeness issues into its finality arguments.

41

enforcement review … of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Laboratories*, 387 U.S. at 139–40. Here, there is no reason to so conclude, as *Texas* recognized. 680 F. Supp. 3d at 806–07.

      1.    Under *Thunder Basin*, the Court must first determine whether "Congress[] creat[ed] … a comprehensive review process … [to] oust[] district courts of jurisdiction." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023). Congress clearly did not intend section 1316(e) to do that. The statute neither "provid[es] in so many words that district court jurisdiction will yield" nor implies such intent by specifying that "review in a court of appeals follow[s] the agency's own review process," such that "the agency effectively fills in for the district court." *Id*. at 185; *cf. Doe v. FAA*, 432 F.3d 1259, 1262 (11th Cir. 2005) (district-court review precluded where statute placed initial judicial review in appellate courts).

      Rather, section 1316(e) provides that a "State *may* appeal a disallowance" to the DAB, and then "*may* obtain judicial review of a decision of the [DAB] by filing an action *in any United States District Court* located within the appealing State." 42 U.S.C. § 1316(e)(2)(A), (C) (emphases added). In its recent rulemaking, CMS agreed that this review procedure "is at the option of the appellant, and States may seek redress in the courts at any time." 89 Fed. Reg. at 41,115:3 (discussing new 42 C.F.R. § 430.3(e), which incorporates the DAB "procedures set forth in 45 C.F.R.

part 16," Appendix A of which implements "review[]" of "disallowances under Title[] … XIX" of the Act, which is section 1316(e)'s express subject); *see id.* at 41,267:1; 45 C.F.R. pt. 16, App. A(a)(1). Thus, section 1316(e) merely prescribes the *optional* internal administrative-review process before review proceeds to *district court*. *Cf.* 42 U.S.C. § 1316(a)(3) (allowing direct appeal to circuit court from agency determination regarding whether State's Medicaid plan conforms to statutory requirements). As the Sixth Circuit recently held, "it would be troublingly counterintuitive to interpret a statute's permissive language as eliminating alternative routes to federal court review." *Tennessee*, 104 F.4th at 604.

2.    Even if section 1316(e) established a comprehensive review process sufficient to preclude district-court review, that bar would apply here only if Florida's "particular claims … were of the type Congress intended to be reviewed within th[at] statutory structure." *Axon*, 598 U.S. at 186. To make that assessment, courts are guided by the three *Thunder Basin* questions. A "yes" to the first two is conclusive in favor of district-court jurisdiction, *Free Enter.*, 561 U.S. at 489–91, and "the same conclusion might follow if the factors point in different directions," *Axon*, 598 U.S. at 186. Here, the correct answer to all three is "yes."

**"[C]ould precluding district court jurisdiction foreclose all meaningful judicial review of the claim?"** *Axon*, 598 U.S. at 186. Yes. If Florida complies with the Bulletin, CMS will have no occasion to render a disallowance decision and

43

therefore Florida could never challenge the Bulletin's policy through section 1316(e)'s administrative process.  CMS proposed that Florida intentionally trigger a disallowance determination by "refus[ing] to comply with" the Bulletin's policy or ancillary duties.  Doc. 40 at 16.  That will not do.  The coercive pressure of losing billions of federal dollars might cause Florida to capitulate to a settlement, depriving it of the chance for judicial review.  *See Tennessee*, 104 F.4th at 606.  Regardless, CMS's proposal is expressly foreclosed by *Free Enterprise*, which held that petitioners did not need to "ignor[e]" administrative requirements and thereby "incur a sanction" in order to "win access to a court of appeals."  561 U.S. at 490–91.  *See Tennessee*, 104 F.4th at 606.

Further, review through section 1316(e)'s process would not be meaningful because it would irreparably harm Florida.  The substantial cost and disruption of complying with the Bulletin in the meantime could not be reimbursed because CMS retains sovereign immunity against such claims, 5 U.S.C. § 702, and the DAB has no authority to do so, *Experts Are Us, Inc.*, 2010 WL 2940935, at *6, Decision No. 2322 (D.A.B. 2010) (DAB cannot award damages).  *See Axon*, 598 U.S. at 191-92 (no meaningful review where irreparable injury); *Tennessee*, 104 F.4th at 606 (same); *cf. Doe*, 432 F.3d at 1262–63 (meaningful review because plaintiffs could still receive full process and relief if they refused to comply with agency's directive).

Nor could the DAB adjudicate Florida's Spending Clause claim. *Salt Lake Cmty. Action Program, Inc. v. Shalala*, 11 F.3d 1084, 1087 (D.C. Cir. 1993).

**"[I]s the claim wholly collateral to the statute's review provisions"?** *Axon*, 598 U.S. at 186. Yes. Section 1316(e) exclusively addresses "determin[ations]" by the Secretary to "disallow[]" a state's FFP, § 1316(e)(1), whereas this suit challenges CMS's policy, not a disallowance determination. CMS argued otherwise because "each of the negative consequences that Florida fears stems from the threat of disallowance" and Florida's claims "go to the heart of the statute and regulations that would be at issue in a proceeding challenging a disallowance." Doc. 40 at 18–19. This case concerns the facial validity of the Bulletin's policy, not a particular disallowance determination. *See Free Enter.*, 561 U.S. at 490 (challenge to agency's existence was collateral to statutory review process for particular actions by agency). Put another way, Florida is "challenging … [CMS's] power to proceed at all, rather than actions taken in the agency proceedings." *Tennessee*, 104 F.4th at 607.

Further, the Supreme Court's decision in *Elgin v. Dep't of Treasury* teaches that a party's claims are not "wholly collateral" to an administrative review scheme only when the party seeks "precisely the kinds of relief that the [statute] empowers the [agency] … to provide." 567 U.S. 1, 22 (2012). That is not so here, where the DAB can neither reimburse Florida for the cost and disruption of complying with

the Bulletin in the meantime nor resolve Florida's constitutional claim. *Supra* pp.44–45.

"**[I]s the claim outside the agency's expertise?**" *Axon*, 598 U.S. at 186. Yes. As *Texas* recognized, based on Supreme Court precedent, this case presents "standard questions of administrative [and constitutional] law," which are "distant from [CMS's] competence and expertise." *Id.* at 194; *see Texas*, 680 F. Supp. 3d at 807; *Tennessee*, 104 F.4th at 607. Nor do Florida's claims "require technical considerations of [agency] policy." *Free Enter.*, 561 U.S. at 491. CMS argued that the DAB could bring to bear its knowledge and understanding of "Medicaid funding and health care-related tax arrangements" in resolving "whether a *specific* redistribution agreement" violated the Act. Doc. 40 at 19. To repeat: that misses the point because this case is not about a specific redistribution agreement; it is a purely legal, facial challenge to the legality of the general policy adopted by the Bulletin.

## III.   FLORIDA IS ENTITLED TO A PRELIMINARY INJUNCTION

A preliminary injunction is warranted if "the moving party shows: (1) it has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Dream Defs. v. Governor of the State of Fla.*,

46

57 F.4th 879, 889 (11th Cir. 2023).  Florida satisfies each requirement and therefore is entitled to preliminary relief enjoining CMS from relying on the policy and underlying statutory interpretation established in the Bulletin, including to conduct an associated FMR of Florida, to defer, reduce, or disallow any Medicaid funding, or to disapprove any Medicaid payment program proposed by Florida.

### A.    Florida Is Likely to Succeed on the Merits

#### 1.    *The Bulletin's Policy Is Contrary to Law*

CMS's new hold-harmless policy, established by the Bulletin, must be held "unlawful," "set aside," and enjoined because it is "not in accordance with law," is "contrary to constitutional … power," and is "in excess of statutory … authority."  5 U.S.C. § 706(2)(A)–(C).  The Bulletin declares that a "hold harmless provision" is any arrangement that "results in a reasonable expectation that the taxpaying hospitals … are held harmless for at least part of their health care-related tax costs."  Doc. 1-7 at 3–4.  Under the Bulletin, even purely private redistribution agreements—i.e., redistribution agreements formed without any governmental control, direction, or even knowledge—are prohibited direct guarantees.  As support for this rule, CMS relies on the definition of "hold harmless provision" found in 42 U.S.C. § 1396b(w)(4)(C)(i).  But the statute does not support CMS's reading.

Section 1396b(w)(4)(C)(i) states that a prohibited hold-harmless provision exists if "[t]he State or other unit of government imposing the tax provides (directly

or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax." The Act expressly and specifically defines "indirect guarantee," § 1396b(w)(4)(C)(ii), which the parties agree is not implicated here.[10] Thus, the statutory language at issue is:

> [t]he State or other unit of government imposing the tax provides []directly … for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax.

This statutory text does not permit the policy announced in the Bulletin.

**a.** As the Seventh Circuit has recognized, under section 1396b(w)(4)(C)(i), a hold-harmless provision exists only if "the *state* promises to hold the taxpayer harmless for a portion of the cost of the tax." *Protestant Mem'l Med. Ctr., Inc. v. Maram*, 471 F.3d 724, 727 (7th Cir. 2006) (emphasis added). The statutory phrase "provides for" means "take measures with due foresight" or "make arrangements for supplying … money," both reflecting the Latin root (*providere*) meaning to "foresee." *Provide*, *v.i.*, Random House Unabridged Dictionary (2d ed. 1993) (defs. 6 & 7). And the statutory verb "guarantee" means "make oneself answerable for (something) on behalf of someone else," "undertake to ensure for another," "serve as a warrant or guaranty for," "engage to … indemnify … against

---

[10] *See, e.g.*, Doc. 22 at 17–18; Defs.' Opp. to Pls.' Mot. for Preliminary Injunction at 30 & n.12, *Texas*, No. 23-cv-161 (E.D. Tex. May 13, 2023), Doc. 17 ("CMS does not contend that" an arrangement wherein "Medicaid funds are redistributed" to "honor" an agreement between hospitals "presents an indirect guarantee.").

loss," or "promise." *Guarantee*, *v.t.*, Random House Unabridged Dictionary (2d ed. 1993) (defs. 7-10 & 12). Neither term means—as CMS would have it—"results in." *See Result*, *v.i.*, *id.* ("be the outcome," "end in a specified manner" (defs. 1-2)). When Congress wanted to specify a payment in the Medicaid context based on its *results*, it said so expressly. *See* 42 U.S.C. § 1396a(n)(1) ("the State plan may provide payment in an amount with respect to the service or item that results in the sum … exceeding the amount"); *id.* § 1396p(c)(4) ("transfer of resources … which results in a period of ineligibility").

Thus, "provide for" and "guarantee" individually, and especially together, indicate that the government intentionally, deliberately, and with certainty causes the taxpayer's liability to be offset—i.e., the government effectuates or requires the reimbursement—not that the government merely serves unknowingly as link in a chain of events that might lead to the tax offset. Indeed, in taking this view, the Bulletin completely ignores the statutory term "directly," which means "without intervening persons, influences, factors, etc." *Directly*, Random House Unabridged Dictionary (2d ed. 1993) (def. 17). As the *Texas* court put it, by "condition[ing] a state's Medicaid funding on private agreements over which states have no knowledge or control," the Bulletin "decouples the 'grammatical link' found in the statute" "between *the government*, as the actor providing for something, and *a guarantee*, as the thing provided for." 680 F. Supp. 3d at 808. "[A]ll a state

49

'provides for' in the Bulletin's scenario is its Medicaid payment, which makes no 'guarantee' to hold anyone harmless." *Id.*

CMS's interpretation allows private entities acting independently of the State to determine the legality of the States' FFP, and to do so anytime and even unwittingly through any kind of financial arrangement. Indeed, private actors could retroactively invalidate a payment of FFP—on which the State had justifiably planned—by forming a financial relationship *after* the FFP was already disbursed. Conversely, the private arrangement could dissipate, again magically changing the legality of the State's plan and undermining the certainty necessary to be a "guarantee." Tr. of Prelim. Injunction Hr'g 36:20–37:2, *Texas*, No. 23-cv-161 (E.D. Tex. June 8, 2023), Doc. 29 (court observing: "[F]or all [the State] knows, tomorrow the[] hospitals could … say we are going to renege on all of our agreements" and not "reimburse each other anymore."); *id*. at 50:16–19 (same). These absurd scenarios bear no relationship to the statutory text. *See Nixon v. Missouri Mun. League*, 541 U.S. 125, 138 (2004) (the "Court will not construe a statute in a manner that leads to absurd or futile results" or that reflects "farfetched" congressional intent).

In the Bulletin, CMS emphasizes the possibility of "indirect payment," where the government is "not … involved in the actual redistribution of Medicaid payments for the purpose of making taxpayers whole." Doc. 1-7 at 4. That is irrelevant

because it conflates the source of the guarantee with the mechanism for effectuating the payment that fulfills the guarantee, e.g., through an intermediary. CMS elsewhere conceded the difference: "both a hold harmless guarantee and the associated payment can [be] provided directly or indirectly." Doc. 22 at 17. *See also* 73 Fed. Reg. at 9,694:1 ("a State can provide a direct or indirect guarantee through a direct or indirect payment"). The pertinent issue is the meaning of "direct guarantee," irrespective of whether the funds are distributed directly to the taxpayer or through an intermediary, i.e., indirectly.

The Bulletin also expresses CMS's concern that "state laws [are] rarely overt in requiring" indemnification. Doc. 1-7 at 4. But that concern only serves to confirm Florida's reading that the guarantee exists only if the *government* orchestrates the indemnification: the government's *requirement* of reimbursement may be overt or covert, but either way, it must be a governmental requirement to create a prohibited hold-harmless provision. Further, Congress already addressed *covert* promises through the definition of "indirect guarantee," § 1396b(w)(4)(C)(ii): when the ratio between the taxes and "the revenue received by the taxpayer" is sufficiently high, the statute expresses Congress's judgment that the governmental unit has promised, i.e., guaranteed, the offset, irrespective of whether CMS can find an express promise to that effect, 42 C.F.R. § 433.68(f)(3)(i). In contrast, then, the "direct" guarantee standard targets overt governmental promises. In effect, through the Bulletin's

interpretation, CMS is trying to "create and apply a new and broader indirect guarantee test, … and then … justify it under the guise of being a direct guarantee test." *Hawaii*, 2005 WL 1540188, at *3. But as the DAB held, "CMS cannot" do that, *id.*, because Congress already defined the scope of "indirect guarantee" in section 1396b(w)(4)(C)(ii).

Finally, under the Constitution's Spending Clause, "Congress must speak unambiguously and with a clear voice when it imposes conditions on federal funds." *W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1141 (11th Cir. 2023). This principle "is a binding constitutional command," enforceable by injunction. *Id.* at 1142. As explained above, the Act clearly limits direct guarantees to situations where the government itself promises, requires, or controls the reimbursement. But even if that were not true, at the very least, section 1396b(w)(4)(C)(i) does not *unambiguously* reach private arrangements, such that the Bulletin's interpretation, if correct, would render the statute unconstitutional. Avoiding an unconstitutional reading is thus another point in favor of Florida's reading of section 1396b(w)(4)(C)(i). *See Immigration & Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 300 (2001).

**b.** The Bulletin also contradicts section 1396b(w)(4)(C)(i) because, unlike the statute, the Bulletin does not require that the governmental taxing unit and the governmental paying unit be the same. The statute expressly requires that the "unit

52

of government imposing the tax" be the same "unit of government" that "provides ... for" the guarantee. 42 U.S.C. § 1396b(w)(4)(C)(i). CMS's new rule disregards this statutory requirement and therefore is unlawful. The Bulletin allows a mismatch the statute does not: private agreements to redistribute payments "from [a] State" constitute prohibited hold-harmless provisions regarding tax programs that CMS understood are imposed by *other* unit[s] of government," e.g., localities. Doc. 1-7 at 2–3. The FMR Letter shows this mismatch in action: in Florida, "cities or counties impose [the] health care-related taxes," while the alleged "payments" that constitute the prohibited guarantee originate from the "state." Doc. 1-8 at 1–2.[11]

### 2.    *The Bulletin Is Arbitrary and Capricious*

"When an agency changes its existing position, it ... must at least display awareness that it is changing position and show that there are good reasons for the new policy," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), and "assess whether there were reliance interests, determine whether they were

---

[11] It makes no difference that local governmental units are created by, and derive their taxing powers from, States. Congress surely knew that and yet enacted a statute that expressly distinguished between "[t]he State" and "other unit[s] of government." 42 U.S.C. § 1396b(w)(4)(C). Indeed, for purposes of section 1396b(w)(4)(C)(i), the Act expressly defines the State as a distinct unit of government from its political subdivisions, including its localities. *See id.* § 1396b(w)(7)(D), (G) ("'State' means only the 50 States and the District of Columbia," and "'unit of local government' means, with respect to a State, a city, county, special purpose district, or other governmental unit in the State").

significant, and weigh any such interests against competing policy concerns," *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020). CMS's failure to do so renders the Bulletin arbitrary and capricious, *id*. at 30, and requires that the new policy be held "unlawful" and "set aside," 5 U.S.C. § 706(2)(A).

The Bulletin incorrectly states that it "reiterates [CMS's] longstanding position." Doc. 1-7 at 1. As explained by the Bulletin's author just a few years before its issuance, the Bulletin's policy prohibiting purely private redistribution arrangements (and allowing a mismatch between the taxing and paying governments) was "unprecedented." *Supra* p.35. CMS failed to acknowledge this abrupt policy change, let alone explain it.

Nor did CMS, in promulgating the Bulletin, account for States' and providers' significant reliance interests in the prior policy. As CMS later admitted, "the immediate elimination of a source of non-Federal share for Medicaid expenditures has the potential to result in state budget shortfalls, potentially leading to reductions in payments that could contribute to solvency issues for providers, including safety net providers, and thereby have an adverse effect on beneficiaries (especially those in underserved communities)." Supp. Bulletin at 1.

### 3.  *The Bulletin Is Procedurally Invalid*

The Bulletin's policy must also be held "unlawful" and "set aside" because it was adopted "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  The APA "mandates that an agency use notice-and-comment procedures before issuing legislative rules," unlike when issuing "interpretive" rules and "general statements of policy."  *Kisor v. Wilkie*, 588 U.S. 558, 583 (2019).  "[L]ook[ing] to the *contents* of the agency's action, not the agency's self-serving *label*," *Azar v. Allina Health Servs.*, 587 U.S. 566, 575 (2019), courts hold that a rule is legislative if it "impose[s] … legally binding requirements" or "forms the basis for an enforcement action," *Kisor*, 588 U.S. at 584.

Despite its "informational" label, the Bulletin is a legislative rule because it "purport[s] to bind those subject to it, that is, to be cast in mandatory language so the affected private parties are reasonably led to believe that failure to conform will bring adverse consequences."  *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 7 (D.C. Cir. 2011).  Indeed, as explained, *supra* pp.13, 25–28, the Bulletin "expressly prohibit[s] certain types of" arrangements, imposes related informational and policing requirements on States, and declares that "violations" thereof "expos[e]" States "to enforcement actions."  *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 114 (D.C. Cir. 2021).

CMS's only answer is that the Bulletin is an "interpretive" rule because its "obligations stem … from statutory and regulatory requirements that long predate the bulletin." Doc. 22 at 24. Once again, that is incorrect. *Supra* pp.7–10, 34–37. At worst, the issue was unresolved until the Bulletin resolved it. Certainly, the Bulletin's policy is not "compel[led]" by the Act or CMS's 2008 Hold-Harmless Rule, *Nat'l Council for Adoption*, 4 F.4th at 114–15; the Bulletin's obligations are not "tightly … drawn linguistically from the actual language of the statute" or the 2008 Hold Harmless Rule, *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009). Otherwise, CMS's 2019 rulemaking to codify the policy now in the Bulletin would have been pointless. *Supra* p.35.

## B.    Florida Will Suffer Irreparable Harm

If the Bulletin is allowed to stand, the State and its hospitals and residents will imminently suffer irreparable harm through significant compliance costs. As explained, to comply with the Bulletin's informational and policing obligations—including their implementation through the current FMR—Florida will have to implement and operate a substantial new oversight program, lest it risk losing billions in federal funding. *Supra* pp.25–27. And as also explained, these compliance costs are unrecoverable, even if Florida ultimately prevails in this lawsuit. *Supra* p.44. "[U]nrecoverable costs of compliance constitute irreparable harm." *Georgia v. President of the United States*, 46 F.4th 1283, 1302 (11th Cir.

56

2022). Moreover, this injury is immediate because the FMR—with its informational demands—remains open and because, as the Supplemental Bulletin makes clear, Florida must develop the necessary oversight structures during the period of enforcement deferment to ensure that it is fully compliant by the end of 2027. *Supra* pp.13, 17–20.

### C. The Public Interest and the Balance of Equities Favor a Preliminary Injunction

The public interest and balance of equities also favor a preliminary injunction. There is "no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Further, there is a strong public interest in maintaining funding for, and thus access to, important healthcare for the millions of low-income Floridians who rely on Medicaid. *See* Doc. 10-1 ¶¶ 5, 38–39. CMS has not disputed these points. *See* Doc. 22 at 11 n.3, 25.

### CONCLUSION

The Court should reverse the judgment, hold that the district court has jurisdiction and that Florida is entitled to a preliminary injunction, and remand for further proceedings.

Dated: July 17, 2024

Respectfully submitted,

ASHLEY MOODY
  *Attorney General*

*s/ Jesse Panuccio*
Jesse Panuccio
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Ste. 1200
Fort Lauderdale, FL  33301
(954) 356-0011
(954) 356-0022 (fax)
jpanuccio@bsfllp.com

*s/ Henry C. Whitaker*
HENRY C. WHITAKER
  *Solicitor General*

JAMES H. PERCIVAL
  *Chief of Staff*

NATALIE P. CHRISTMAS
  *Senior Counselor*

David M. Lehn
Cameron C. Miller
BOIES SCHILLER FLEXNER LLP
1401 New York Ave. N.W.
Washington, D.C.  20002
(202) 237-2727
(202) 237-6131 (fax)
dlehn@bsfllp.com
cmiller@bsfllp.com

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL  32399-1050
(850) 414-3300
(850) 414-2672 (fax)
henry.whitaker@myfloridalegal.com

*Counsel for Appellant*
*the State of Florida*

*Counsel for Appellant Florida Agency*
*for Health Care Administration*

58

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

**Type-Volume**: This document complies with the word limit of FRAP 32(a)(7)(B) because, excluding the parts of the document exempted by FRAP 32(f), this document contains 12,746 words.

**Typeface and Type-Style**: This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6).

*s/ Jesse Panuccio*
Jesse Panuccio

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on July 17, 2024, a copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, and served on counsel of record either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically generated notices of filing.

*s/ Jesse Panuccio*
Jesse Panuccio